## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| FUNCTIONAL HIIT FITNESS, LLC | **)** | Civil Action No. |
| | **)** | Hon. |
| *Plaintiff*, | **)** | |
| | **)** | |
| v. | **)** | |
| | **)** | |
| F45 TRAINING INCORPORATED, | **)** | |
| ADAM GILCHRIST, ROBERT | **)** | |
| DEUTSCH, MARC MARANO, LUKE | **)** | |
| ARMSTRONG and | **)** | |
| NICK ABRAHAMS, | **)** | |
| | **)** | |
| *Defendants*. | **)** | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Functional HIIT Fitness, LLC ("FHF" or "Plaintiff"), by and through their undersigned attorneys, bring this action (the "Claims") against Defendants F45 Training Incorporated ("F45"), Adam Gilchrist ("Mr. Gilchrist"), Robert Deutsch ("Mr. Deutsch"), Marc Marano ("Mr. Marano"), Luke Armstrong ("Mr. Armstrong") and Nick Abrahams ("Mr. Abrahams") (F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano, and Mr. Abrahams collectively, the "Defendants").  Plaintiff complains as follows.

## Nature of the Action

1.      This case concerns a franchisor (F45) and certain of its current and former executives (Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong,

and Mr. Abrahams) who violated the Federal Trade Commission's ("FTC") Franchise Rule, as found at 16 C.F.R. 436 *et seq.*, and certain state laws, by fraudulently inducing a company (FHF) with neither the company nor its principal, Donald Jordan ("Mr. Jordan"), having any experience in the opening and operation of a franchised location – into three Franchise Agreements and other ancillary arrangements.

2.      In particular, when courting the company (FHF) into the first two Franchise Agreements, the franchisor (F45) and its executives (Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams) furnished the company (FHF) with a Franchise Disclosure Document that was outdated and otherwise contained inaccurate, incomplete, unfair, deceptive, and/or misleading information.  The franchisor (F45) and its executives (Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams) also made baseless promises and representations outside the four corners of the stale Franchise Disclosure Document during the course of courtship.

3.      FHF reasonably and detrimentally relied on all of this outdated, stale, inaccurate, incomplete, unfair, deceptive, and/or misleading information, and all the baseless promises and representations, when entering into the first two Franchise Agreements and other ancillary arrangements.

4.      As to the third Franchise Agreement, the franchisor (F45) and its

executives (Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams) courted FHF into that contractual relationship without the furnishing of <u>any</u> Franchise Disclosure Document whatsoever in connection with that franchise opportunity.  Accordingly, FHF and Mr. Jordan were deprived – at a very basic level – of the protections of applicable federal and state law when making the decision to enter into the third Franchise Agreement.

5.     Moreover, this case concerns a franchisor (F45) who has breached contractual commitments to a franchisee (FHF) by, among other things, charging fees and costs that are not set forth or otherwise memorialized/reserved in the applicable Franchise Agreement.  In so doing, the franchisor (F45) has been unjustly enriched at the expense of the franchisee (FHF).

6.     The unlawful acts and practices of the franchisor (F45) and certain of its current and former executives (Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams) have resulted in material and significant financial losses and emotional hardship to the company (FHF).

7.     Through this action, FHF seeks, among other things: disgorgement of unlawfully obtained and retained monies; rescission of the Franchise Agreements and other ancillary arrangements; damages, as provided for

under applicable law; interest; and attorneys' fees and costs, also allowed and recoverable under applicable law.

## Parties

### A.   Plaintiff

8.   FHF is a Michigan limited liability company (company number: 802304356) with an address of 45216 Courtview Trail, Novi, Michigan 48375.

9.   Mr. Jordan is the sole member of FHF, and is a citizen and resident of the State of Michigan.

10.   FHF currently operates a single franchised location at the following address: 19716 Haggerty Road, Livonia, Michigan, 48152.

11.   That Livonia location is operated pursuant to the Franchise Agreement that concerns a franchise license for a territory in North Livonia, Michigan.

12.   The Livonia location had a soft opening on or about February 8, 2020, with its grand opening on or about February 22, 2020.  The location was subsequently closed on or about March 16, 2020 on account of Michigan Governor Gretchen Whitmer's Executive Order related to the COVID-19 pandemic.

13.   The Livonia location remained shut down for regular classes until about September 8, 2020, when another Executive Order allowed the location

4

to open again but at 25% of capacity and with social distancing restrictions. The location has remained open since then, but under certain restrictions that indirectly concealed certain of the fraudulent misrepresentations of Defendants, including, but not limited to, with respect to financial performance representations.

14.     Upon information and belief, F45 has charged and taken royalties and other fees from FHF on all three Franchise Agreements, even though only one location of FHF is open and the United States (in general), and the State of Michigan (in particular), continue to suffer from the COVID-19 pandemic. This pandemic constitutes a *force majeure* event under the Franchise Agreements.

**B.     Defendants**

15.     Upon information and belief, F45 is a Delaware corporation with a principal place of business located at 801 Barton Springs Road, 9th Floor, Austin, Texas 78704.

16.     Upon information and belief, during the course of time that FHF was courted into the three Franchise Agreements at issue, F45's principal place of business was located at 236 California Street, El Segundo, California 90245.  In other words, F45 offered and sold certain franchise opportunities to FHF from the State of California.

5

17.    Upon information and belief, Mr. Gilchrist is a citizen of the Commonwealth of Australia and a resident of Austin, Texas.   Upon information and belief, he currently has a business address of 801 Barton Springs Road, 9th Floor, Austin, Texas 78704.

18.    Upon information and belief, Mr. Gilchrist currently serves as Director and Chief Executive Officer of F45.  Upon information and belief, Mr. Gilchrist held those same positions during the course of time that FHF and Mr. Jordan were courted into the three Franchise Agreements at issue.

19.    Upon information and belief, Mr. Marano is a citizen of the Commonwealth of Australia and a resident of Los Angeles, California.  Upon information and belief, he currently has a business address of 11111 W. Olympic Boulevard, Suite 213, Los Angeles, California 90064.

20.    Upon information and belief, Mr. Marano served as President of F45's U.S. expansion during the course of time that FHF and Mr. Jordan were courted into the three Franchise Agreements at issue.

21.    Upon information and belief, Mr. Armstrong is a citizen of the Commonwealth of Australia and a resident of Austin, Texas.   Upon information and belief, he currently has a business address of 801 Barton Springs Road, 9th Floor, Austin, Texas 78704.

22.    Upon information and belief, Mr. Armstrong currently serves as

Chief Revenue Officer of F45.  Upon information and belief, Mr. Armstrong served as F45's Global Head of Sales during the course of time that FHF and Mr. Jordan were courted into the three Franchise Agreements at issue.

23.    Upon information and belief, Mr. Abrahams is a citizen of the Commonwealth of Australia and a resident of Los Angeles, California.  Upon information and belief, he currently has a business address of 6221 Wilshire Blvd #101, Los Angeles, California 90048.

24.    Upon information and belief, Mr. Abrahams served as F45's Director of Sales and Business Development during the course of time that FHF and Mr. Jordan were courted into the three Franchise Agreements at issue.

25.    Upon information and belief, Robert Deutsch is a citizen of the Commonwealth of Australia and a resident of Australia.

26.    Upon information and belief, Mr. Deutsch served as F45's Co-Chief Executive Officer and countersigned the Franchise Agreements on behalf of F45.

27.    Upon information and belief, F45 is, or was at all relevant times, owned and/or operated by individuals who have significant experience with the franchise industry and related federal and state laws pertaining to franchising.

7

28.     M.C.L. § 445.1539 permits service on all Defendants, providing, in

part, as follows:

> When a person, including a nonresident of this state, engages in conduct prohibited or made actionable by this act . . . whether or not the person has filed a consent to service of process, and personal jurisdiction over the person cannot otherwise be obtained in this state, that conduct shall be considered equivalent to an appointment of the the corporations and securities bureau of the department of commerce to be his or her attorney to receive service of a lawful process . . . with the same force and validity as if served on the person personally.

## **Jurisdiction and Venue**

29.     This District Court for the Eastern District of Michigan, Southern

Division, has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1332 as there is complete diversity of citizenship and the amount in

controversy exceeds $75,000.00 exclusive of interest and costs.

30.     Venue lies in this Eastern District of Michigan, Southern Division,

pursuant to 28 U.S.C. §1391.  Notably, the franchised businesses and related

property are located within this division, namely 19716 Haggerty Road,

Livonia, Michigan, 48152, and a substantial part of the events or omissions

giving rise to the claims occurred in this district.

31.     Venue in this state is also proper as M.C.L. § 445.1527(f) voids

any provision in a franchise agreement that requires arbitration or litigation

to be conducted outside the State of Michigan.  See Lakeside Surfaces, Inc. v. Cambria Co., LLC, 16 F.4th 209 (6th Cir. 2021).

32.    Certain consumer and franchisee protection statutes of Michigan, Califoria and Delaware apply to this dispute, and in the alternative Michigan common law and Delaware common law.

33.    A mediation with respect to the issues in this dispute was first contemplated in and around March 2021 as a purported contractual precondition to the commencement of this lawsuit.

34.    Upon information and belief, due to certain improper and/or unsavory tactics on the part of F45 and its representatives, a mediation was only held on or about June 23, 2021.  Those improper and/or unsavory tactics are actionable under one or more theories of liability, including, but not limited to, breach of contract.

35.    Certain negotiations took place following the mediation, and upon information and belief, F45 and its representatives did not act in good faith during the course of those negotiations.

36.    Indeed, F45's improper and unsavory tactics continued prior to the filing date of this litigation, notably in relation to the parties' extension of a tolling agreement entered into between Plaintiffs, on the one hand, and F45 and Mr. Gilchrist, on the other hand, on September 28, 2021, which was set to

expire "not later than December 31, 2021" (the "September 28, 2021 Tolling Agreement").

37.     The September 28, 2021 Tolling Agreement tolled any applicable statutes of limitations or repose for claims of breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, fraudulent inducement and misrepresentation, negligent misrepresentation, unjust enrichment, and violation of the Michigan Franchise Investment Law ("MFIL"), M.C.L. §445.1501 *et seq*, from March 23, 2021 to December 31, 2021, and with respect to claims of violations of the California Franchise Investment Law, the Delaware Uniform Deceptive Trade Practices Act and the Texas Deceptive Trade Practices-Consumer Protection Act from September 24, 2021 to December 31, 2021.

38.     On December 22, 2021, prior to the expiration date of the September 28, 2021 Tolling Agreement, prior counsel to Plaintiff, Matthew DeAntonio ("Mr. DeAntonio") sent an e-mail to counsel for Defendants, Tonya Esposito ("Ms. Esposito") of Seyfarth Shaw, LLP (with copy to her colleague, Andrew Sherman, Esq. ("Mr. Sherman")), seeking an extension of the September 28, 2021 Tolling Agreement through to January 17, 2022.

39.    Having received no response, and given the impending holiday, Mr. DeAntonio e-mailed Ms. Esposito (with copy to Mr. Sherman) again on the same day.  The e-mail reads, in part, as follows:

> I am sorry for the multiple emails, but I wanted to follow up on two items pertaining to my below email.
>
> First, I ask that you please let us know your position on the tolling agreement by the end of the week. If we don't have an agreement by then, the litigation team will get started working on a complaint.

40.    On Sunday, December 26, 2021, at 9:27PM EST, Ms. Esposito finally responded to Mr. DeAntonio's e-mails.  Her response e-mail reads, in part, as follows:

> We agree to this:
>
> "I suggest the parties agree to a short extension of the tolling agreement, through Monday, January 17. If we do this, I ask for F45's good faith assurance that it will use this extra time to engage in meaningful negotiations with FHF and Mr. Jordan."
>
> I am on vacation this week but will be back on-line Monday January 3.

41.    At no time prior to Ms. Esposito's email had she indicated that she was on vacation with a plan to return on Monday January 3, 2022, nor did Mr. DeAntonio receive an "out of office" notification from Ms. Esposito's e-mail account. Additionally, at no time prior to Ms. Esposito's e-mail did Mr.

Sherman indicate that Ms. Esposito was on vacation and would not be able to respond to Mr. DeAntonio's emails in a timely fashion.

42.    On Monday, December 27, 2021, following receipt of Ms. Esposito's e-mail, Mr. DeAntonio again e-mailed Ms. Esposito and Mr. Sherman, enclosing an amendment to the September 28, 2021 Tolling Agreement (the "Amendment").  That e-mail reads, in part, as follows:

> Dear Tonya and Andrew,
>
> Thanks for this message. We have drafted the attached amendment to the tolling agreement that memorializes the contemplated extension. Given that the tolling agreement otherwise terminates <u>Dec. 31</u>, we need to execute this amendment by tomorrow. Please confirm you will be able to make that happen.
>
> Andrew—since Tonya is out of the office, I am happy to work with you to finalize this amendment. I will call you now to discuss.

43.    Mr. Sherman responded to Mr. DeAntonio's e-mail that same day (i.e., Monday, December 27, 2021).  That e-mail reads, in part, as follows:

> My mother-in-law passed last night and I will be tied up for a few days for the funeral and religious observances. I may be in the office this Thursday if you want to check in with me in the morning.

44.    Given Mr. Sherman's response and the difficulties noted therein, Mr. DeAntonio again e-mailed Mr. Sherman on December 27, 2021. That e-mail reads, in part, as follows:

> I am so sorry to hear about your mother-in-law. I'll be thinking about you and your family.

So that I can avoid disrupting your time with your family later this week, would it be acceptable if I reached out directly to F45's in house counsel, Patrick Grosso ([pgrosso@f45hq.com](mailto:pgrosso@f45hq.com)), copying you and Tonya on all communications, for the sole purpose of executing this amendment?

45.     Patrick Grosso, F45's General Counsel, had previously been carbon copied on e-mails from Seyfarth Shaw, including an e-mail from Daniel Blumenthal to Mr. DeAntonio dated October 14, 2021, relating to this matter.

46.     Mr. Sherman responded to Mr. DeAntonio that same day (*i.e.*, December 27, 2021).  That e-mail reads, in part, as follows:

> Let me check with him. I believe he is on holiday and really don't want to bother him unnecessarily.

47.     Mr. DeAntonio responded to Mr. Sherman's e-mail that same day (i.e., Monday, December 27, 2021). That e-mail reads, in part, as follows:

> I don't want to interfere with your bereavement and am happy to work with another lawyer in your firm to get this agreement executed. I am also happy to circulate the amendment (which is straightforward) to the necessary recipients via docusign.
>
> Alternatively, given the forthcoming expiration of the tolling agreement, if you have another suggestion for getting this signed, please let me know.

48.     Mr. Sherman did not respond to Mr. DeAntonio's e-mail, nor did any other lawyer in Mr. Sherman's firm, and in light of the lack of response (including as to whether Mr. Sherman had checked with Mr. Grosso), and

pursuant to Mr. Sherman's invitation to call him on the morning of December 30, 2021, Mr. DeAntonio called Mr. Sherman, but was unable to reach him.

49.     Shortly after attempting to call Mr. Sherman on December 30, 2021, Mr. DeAntonio e-mailed Mr. Sherman. That email reads, in part, as follows:

> I called your office around 10:00 this morning, but you were on the other line, and I left a message with your staff. Since we are nearing the end of the day and approaching another holiday weekend, I wanted to follow up with an email.
>
> On December 26, Tonya wrote that F45 "agree[d]" to the extension of the tolling agreement, specifically, "a short extension of the tolling agreement, through Monday, January 17" and that F45 would "use this extra time to engage in meaningful negotiations with FHF and Mr. Jordan." Since then, I have attempted to coordinate memorializing that agreement in a formal amendment to the tolling agreement. We drafted an amendment and, when we learned Tonya was on vacation and you were out for bereavement, offered to work with another of your colleagues, circulate it via DocuSign, or correspond directly with F45's legal department.
>
> While our preference would have been to finalize a formal amendment before December 31, we view Tonya's December 26 email as an enforceable agreement. That said, I hope we can document this agreement in writing after the New Year.

50.     On December 30, 2021, at 5:53PM EST, Mr. Sherman finally responded to Mr. DeAntonio's email. That email reads, in part, as follows:

> Confirming that we have a handshake on the tolling agreement. I've been busy all day trying to get transactions closed before year end. As I mentioned to you earlier in the week, I would rather not disturb

Patrick Grosso while he's on vacation this week and I'm sure that we will get this documented early next week. Have a good New Year's eve.

51.     As noted above, Mr. Sherman did not notify Mr. DeAntonio of any attempt to "check with" Mr. Grosso, or notify him that he did not intend so to do, as he had promised in his email of December 27, 2021.

52.     On January 3, 2022, having received no further response from Mr. Sherman, Mr. DeAntonio again e-mailed Mr. Sherman, copying Ms. Esposito, following up on the Amendment. That e-mail reads, in part, as follows:

> Happy New Year to both of you. Now that the holiday has passed, I wanted to follow up on a few matters on this case.
>
> First, I have reattached the First Amendment to Tolling Agreement that I originally sent you on December 27. I ask that you please secure F45's and Mr. Gilchrist's signatures and return an executed copy to me. I will do the same for our side's signatures. We are eager to execute this amendment to paper our agreement, hopefully tomorrow (Tuesday, January 4). If you anticipate not being able to obtain signatures tomorrow, please let me know.

53.     On January 4, 2022, and again having received no response, Mr. DeAntonio e-mailed Mr. Sherman and Ms. Esposito. That e-mail reads, in part, as follows: "Could you please provide an update on the below. Mr. Jordan has signed the agreement."

54.     Despite responding to other matters contained in Mr. DeAntonio's e-mails, neither Ms. Esposito, nor Mr. Sherman have ever responded to the requests for F45 to sign and return the Amendment.

55.     The foregoing is emblematic of F45's lack of good faith.

56.     Mr. Sherman's e-mail of December 30, 2021, wherein he confirmed the extension of the Tolling Agreement, acted as an extension of the Tolling Agreement to January 17, 2022.

57.     Even if Defendants attempt to claim that the extension of the Tolling Agreement is not effective, all of Plaintiff's claims pled in this Complaint are timely under any applicable statutes of limitations or contractual limitations periods (if legal, enforceable, and applicable).

58.     This action is ripe for adjudication.

## Factual Allegations

### A.     Overview of Consumer/Franchisee Protection Law

59.     A "franchise" offering by a franchisor must comply with the FTC's Franchise Rule and relevant state laws.

60.     For instance, and without limitation, the FTC's Franchise Rule, and relevant state laws, require a franchisor to provide a prospective franchisee with a current Franchise Disclosure Document that discloses specific information about the franchise opportunity.   The disclosures must be accurate and cannot mislead or deceive the prospective franchisee.

61.     In particular, 16 CFR §436.2(a) provides as follows:

In connection with the offer or sale of a franchise located in the United States of America, or its territories, unless the transaction is exempted under subpart E of this part, it is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act:

(a) For any franchisor to fail to furnish a prospective franchisee with a copy of the franchisor's current disclosure document, as described in subparts C and D of this part, at least 14 calendar-days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

62.    Similarly, the MFIL, at M.C.L. 445.1508(1) states:

A franchise shall not be sold in this state without first providing to the prospective franchisee, at least 10 business days before the execution by the prospective franchisee of any binding franchise or other agreement or at least 10 business days before the receipt of any consideration, whichever occurs first, a copy of the disclosure statement described in subsection (2), the notice described in subsection (3), and a copy of all proposed agreements relating to the sale of the franchise.

63.    As a second example, and without limitation, the FTC's Franchise Rule, and relevant state laws, prevent a franchisor and its representatives from making financial performance representations to a prospective franchisee that are not set forth within the four corners of a Franchise Disclosure Document.

64.    In particular, 16 CFR §436.9(c) makes it an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act for any franchise seller covered by part 436 to:

17

Disseminate any financial performance representations to prospective franchisees unless the franchisor has a reasonable basis and written substantiation for the representation at the time the representation is made, and the representation is included in Item 19 (§ 436.5(s)) of the franchisor's disclosure document.

65.    The prospective franchisee is a consumer in the marketplace looking to invest in a franchise opportunity, who merits the review and consideration of all relevant and material information that is up-to-date on the franchise offering.

66.    To that end, a franchisor, under applicable law, must make sure that its Franchise Disclosure Document, and other courtship/marketing documents and oral representations, are materially accurate and current.

67.    Put differently, a franchisor's officers, directors, employees, agents, and representatives must not misrepresent the franchise opportunity in any document or in any oral statements made to induce a franchise relationship.

68.    In a similar vein, 16 C.F.R. § 436.7(b) requires, in sum and substance, a franchisor to revise its Franchise Disclosure Document within a reasonable period after the close of a fiscal quarter wherein there is a material change in circumstance or information.

69.    Further, the FTC's Franchise Rule mandates that a franchisor update its Franchise Disclosure Document within one-hundred, twenty (120) days of the close of its fiscal year.

70.    Upon information and belief, the fiscal year of F45 corresponds with the calendar year.

71.    Notably, neither the FTC's Franchise Rule, nor relevant state law, enables a franchisor's strict compliance with the FTC Franchise Rule to lead to the creation of a "safe harbor" from a fraud in the inducement claim brought by a franchisee against the franchisor. See, e.g., Colorado Coffee Bean v. Peaberry Coffee, 251 P.3d 9, 22-23 (Colo. App. 2010), cert. denied, 2010 WL 4400079, aff'd after remand, 2012 WL 3031448, and cert. denied, 2013 WL 1715303 (a franchisor's compliance with the FTC's Franchise Rule is not a safe harbor in connection with a franchisee's concealment claim).

72.    A prospective franchisee must have a fair and reasonable opportunity to assess the franchise opportunity, with all material facts and information before the prospective franchisee, before deciding to enter into a franchise relationship with the franchisor.

73.    Yet here, in this case, F45 and its executives did not comply with the FTC's Franchise Rule and relevant state law.  And even if F45 did comply with the FTC's Franchise Rule – and there is most definitely a lack of

19

compliance – F45, on information and belief, withheld material, accurate information related to the investment opportunity, and made materially misleading statements and omissions.

**B.    F45 Fraudulently Induces FHF Into Two Franchise Agreements In April 2019**

74.    Mr. Jordan, the principal of Plaintiff, explored the possibility of acquiring a franchise-based business in 2019.

75.    Prior to this effort, Mr. Jordan nor the Plaintiff had ever acted, or sought to act, as a franchisor.  Further, Mr. Jordan nor the Plaintiff never acted, nor sought to become, a franchisee of any brand.

76.    In and around January or February 2019, Mr. Jordan and Plaintiff became interested in obtaining a license to own and operate a F45 franchised business.

77.    According to its website, https://f45training.com, last visited January 19, 2022, "F45 is specifically designed to provide a functional full-body workout while improving energy levels, metabolic rate, strength, and endurance."

78.    According to its website, https://www.f45invest.com, last visited January 19, 2022, "F45 sets itself apart with a proprietary business model for franchisees. F45 is a dynamic and ever-evolving leader in innovation across

the health and fitness industry, offering a unique opportunity that is driven by quality, reputation, and convenience."

79.    The advertisements and sales pitches for F45 brand spoke volumes to Mr. Jordan and Plaintiff at the time, as the brand appeared to be exciting and had significant opportunities for growth.

80.    In or around March 2019, Mr. Jordan first made contact with F45. He eventually communicated with Mr. Marano, who, at the time and during the course of courtship into the three Franchise Agreements in question, served as F45's President of U.S. Expansion.

81.    At some point in time in March 2019, F45 furnished Mr. Jordan and Plaintiff with a Franchise Disclosure Document bearing a date of issuance of April 19, 2018 (the "April 19, 2018 Franchise Disclosure Document").  A true and accurate copy of the April 19, 2018 Franchise Disclosure Document furnished to Mr. Jordan is attached hereto at Exhibit 1.

82.    Upon information and belief, at that point in March 2019, the April 19, 2018 Franchise Disclosure Document had already been superseded by another Franchise Disclosure Document dated September 11, 2018.  As further discussed below, a copy of that September 11, 2018 Franchise Disclosure Document had never been furnished to Plaintiff.

83.    Upon information and belief, Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams assisted in the development, construction, and/or issuance of the April 19, 2018 Franchise Disclosure Document.

84.    Mr. Jordan, as the Member of Plaintiff, reviewed that April 19, 2018 Franchise Disclosure Document and further communicated with Mr. Marano about the franchise opportunity on behalf of Plaintiff.

85.    Notably, 16 CFR §436.9(c) makes it an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act for any franchise seller covered by part 436 to:

> Disseminate any financial performance representations to prospective franchisees unless the franchisor has a reasonable basis and written substantiation for the representation at the time the representation is made, and the representation is included in Item 19 (§ 436.5(s)) of the franchisor's disclosure document.

86.    Also notable, Item 19 of the April 19, 2018 Franchise Disclosure Document reads, in part, as follows:

### ITEM 19
### FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the

actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about performance at a particular location or under particular circumstances.   We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets.

87.    Nevertheless, on March 17, 2019, Mr. Marano e-mailed to Mr. Jordan and Plaintiff a (now non-functioning) link to a spreadsheet for a financial model which showed a franchise studio reaching breakeven on case flow of just over four (4) months and a payback period of eighteen (18) months with an internal rate of return (IRR) of around 66%.  Those financial performance representations are, and were at the time they were made, false, inaccurate, incomplete, unfair, deceptive, and/or misleading, and were made to induce FHF into a franchise relationship.  A copy of the e-mail is attached hereto at Exhibit 2.

88.    As a second example, and without limitation, an e-mail dated March 26, 2019 from Plaintiff's Mr. Jordan to Mr. Marano (attached hereto at Exhibit 3) reads, in part, as follows:

I reviewed the FDD and had a few questions. Other FDDs I have reviewed often give average or median unit economics such as average revenue, costs, EBITDA, net income and membership (number and fees).

Does F45 have similar unit economic averages for the US market?

89.     As a third example, and without limitation, an e-mail dated March 30, 2019 from Plaintiff's Mr. Jordan to Mr. Marano (attached hereto at <u>Exhibit 4</u>) reads, in part, as follows:

> I have been putting together my own spreadsheet for F45. As a part of the process, is there a time allocated to go over unit economics? I want to go over things like membership fees, average members per location and breakdown, retention rates, number of employees, coaches and suggested compensation, marketing techniques, etc.

> Also would it be ok if I contacted the franchisee in Grand Rapids Michigan to discuss his or her experience.

90.     On March 31, 2019, Mr. Marano responded to Mr. Jordan's e-mail of March 30, 2019.  Mr. Marano's response (also found at <u>Exhibit 4</u> hereto) reads, in part, as follows:

> Definitely, let's get together this week and discuss.

> You can definitely contact Grand Rapids. Holly (owner) is great.

> Speak soon and enjoy your Sunday.

91.     During the month of March 2019 or early April 2019, and in close proximity in time to the e-mails which are attached at <u>Exhibits 3 and 4</u> hereto, Mr. Marano and Plaintiff's Mr. Jordan held a number of lengthy telephone discussions about the financial model for the franchised business.  During those telephone discussions, Mr. Marano made a number of financial performance representations to Plaintiff's Mr. Jordan that, upon information

and belief, are not memorialized or otherwise set forth in the April 19, 2018 Franchise Disclosure Document that was furnished to Plaintiff's Mr. Jordan.

92.     For example and without limitation, Mr. Marano, on behalf of F45 and at the control and direction of others at the franchisor (F45), represented to Plaintiff's Mr. Jordan by phone that if he (*i.e.*, Plaintiff's Mr. Jordan) followed the F45 program, his studios would break even in three months and reach an EDITBA of 33% by the end of year one.   Those financial performance representations are not memorialized or otherwise set forth in the April 19, 2018 Franchise Disclosure Document that was furnished to Plaintiff's Mr. Jordan.   Additionally, upon information and belief, those financial performance representations are, and were at the time known to be, false, inaccurate, incomplete, unfair, deceptive, and/or misleading, and were made to induce Plaintiff into a franchise relationship with F45.

93.     Upon information and belief, at the time of making those financial performance representations, Mr. Marano, and others at F45 knew that those representations were false, inaccurate, incomplete, unfair, deceptive, and/or misleading, and were willingly made for the purpose of inducing FHF into a franchise relationship with F45.

94.     In the alternative, Mr. Marano made those financial performance representations, personally and at the direction of others at F45, with a

reckless disregard for their truth or made them without due care and attention.

95.    Notably, F45 issued a new Franchise Disclosure Document on or about April 18, 2019 (the "April 18, 2019 Franchise Disclosure Document"). Upon information and belief, that April 18, 2019 Franchise Disclosure Document set forth certain material information and changes to the franchise offering that was being considered by Plaintiff that was not set forth in the April 19, 2018, Franchise Disclosure Document that was previously furnished to Plaintiff's Mr. Jordan for the purpose of Plaintiff's reliance.

96.    The purported material changes and information in the April 18, 2019 Franchise Disclosure Document include, without limitation, the following:

  a. An increase in the total investment necessary to begin operations from a range of $210,000 to $289,000 to a range of $227,000 to $312,000.

  b. An increase in the amounts that must be paid to F45 or its affiliate from a range of $158,000 to $161,000 to a range of $177,200 to $202,200.

  c. A notification that F45's affiliate, Group Training LLC ("Group Training") owns and operates seven Studios through various subsidiaries.

  d. An increase in the fee payable from $2,500 per month to the greater of 7% of Gross Sales or $2,500 per month.

e.  A change from requiring the Franchisee to spend $2,500 per month on local advertising to paying F45 that amount.

f.  A reduction in the number of LionHeart heart rate monitors that would be supplied from 200 to 100 units.

g.  A Balance Sheet for F45 as of January 31, 2019.

h.  That a litigation between F45 and its franchisee, Monica Walus and Fit Empire Incorporated, which alleged, *inter alia*, deceptive trade practices and consumer fraud, was settled, in part through by Group Training purchasing the Walus' F45 studio for $231,882.

97.    A true and accurate copy of a redline of the changes that were made to the April 19, 2018 Franchise Disclosure Document by way of the April 18, 2019 Franchise Disclosure Document is attached hereto at <u>Exhibit 5</u>.  This redline was found and downloaded by one of Plaintiff's counsel from a State of Minnesota – Department of Commerce website.

98.    Upon information and belief, that redline found at <u>Exhibit 5</u> was created by F45 and/or its counsel and submitted to the State of Minnesota.

99.    Upon information and belief, F45 never furnished the redline attached at <u>Exhibit 5</u> to Plaintiff or Mr. Jordan.

100.   However, on or around April 23, 2019 Mr. Marano sent an e-mail to Plaintiff's Mr. Jordan. That e-mail reads, in part, as follows:

Donald,

Hope you are well. Writing to inform you that a new FDD will come into affect (sic) **MAY 1st 2019.**

I have attached a link below for your review.

FRANCHISE DISCLOSURE DOCUMENT

Please note the largest change is the franchise royalty fee is (sic) moving from **$2500** per month to **$2500 or 7.5%** of the monthly turnover which ever is the greater.

For those who already have agreement/s please take advantage and complete as soon as possible.

101.  The link in the April 23, 2019 email was not functional, and the purpose of the e-mail was to rush and pressure Mr. Jordan to enter the proposed agreements with F45 as soon as possible. Upon information and belief, no executed Item 23 Receipt exists that would evidence that Plaintiff ever received and reviewed F45's April 18, 2019 Franchise Disclosure Document in April 2019.  Further, upon information and belief, no such Item 23 Receipt is in the possession, custody, and/or control of F45.

102.  On or about April 26, 2019 – three (3) calendar days after F45 purported to deliver the April 18, 2019 Franchise Disclosure Document to Plaintiff's Mr. Jordan  – Plaintiff entered into two Franchise Agreements with F45: (i) one related to a territory in North Livonia, Michigan; and (ii) one related to a territory in Northville, Michigan which Plaintiff's performance was guaranteed by Mr. Jordan.

103.  The Franchise Agreement that concerns a territory in North Livonia, Michigan, with a true and accurate copy of that Franchise Agreement attached hereto at <u>Exhibit 6</u>, was subject to amendment on or about August 1, 2019.  A true and accurate copy of that amendment is attached hereto at <u>Exhibit 7</u>.

104.  The Franchise Agreement that concerns a territory in Plymouth-Northville, Michigan, with a true and accurate copy of that Franchise Agreement attached hereto at <u>Exhibit 8</u>, was subject to amendment on or about September 24, 2019.  A true and accurate copy of that amendment is attached hereto at <u>Exhibit 9</u>.

105.  Importantly, the Franchise Agreements attached hereto at <u>Exhibits 6 and 8</u> appear to be based on an F45 Franchise Disclosure Document that was issued on or about September 11, 2018, which was never furnished to Plaintiff.

106.  Of equal, if not greater, importance, the April 18, 2019 Franchise Disclosure Document, to the extent furnished to Plaintiff/Mr. Jordan on April 23, 2019, necessarily meant that Plaintiff/Mr. Jordan could not execute a binding, enforceable franchise agreement until May 2019.  After all, there is a fourteen (14) day cooling off period required under the FTC Franchise Rule and also a ten (10) business day cooling off period required under the MFIL.

**C.  F45 Fraudulently Induces FHF Into A Third Franchise Agreement In September 2019**

107.  In addition to the foregoing, F45 and its executives continued to court Plaintiff in order to induce it to enter into a third Franchise Agreement.

108.  On or about July 22, 2019, Mr. Armstrong sent two (2) emails to Plaintiff's Mr. Jordan with a link, accessible by clicking on the button in the emails marked "View our Franchise Financials," to, upon information and belief, the same or a similar spreadsheet that Mr. Marano provided to Plaintiff's Mr. Jordan in March 2019. Those emails are attached at <u>Exhibits 10 and 11</u> hereto.

109.  This spreadsheet, which is attached at <u>Exhibit 12</u> hereto, is titled "F45 TRAINING EUR FINANCIAL MODEL" represented to Mr. Jordan, *inter alia*, that for a total investment of €194,500 (which based upon mid-market exchange rates for July 22, 2019 would amount to $217,601 – and which amount would probably not even cover the leasehold improvements for a franchise), there would be a cash flow break even at just over four (4) months, and a payback period on investment of eighteen (18) months, which is an IRR of about 66%. Upon information and belief, those financial performance representations are not memorialized or otherwise set forth in the April 19, 2018 Franchise Disclosure Document that was furnished to Plaitniff's Mr.

Jordan, or in the April 18, 2019 Franchise Disclosure Document.  Additionally, upon information and belief, those financial performance representations are false, inaccurate, incomplete, unfair, deceptive, and/or misleading, and were knowingly and intentionally made to induce Plaintiff into a franchise relationship with F45.

110.   Upon information and belief, at the time of making those financial performance representations, Mr. Armstrong,  and others at F45 knew that those representations were false, inaccurate, incomplete, unfair, deceptive, and/or misleading, and were willingly made for the purpose of inducing Plaintiff into a franchise relationship with F45.

111. In   the   alternative,   Mr.   Armstrong   made   those   financial performance representations, personally and at the direction of others at F45, with a reckless disregard for their truth or made them without due care and attention.

112.   Further, upon information and belief, none of the above financial performance representations were memorialized or otherwise set forth in the April 18, 2019 Franchise Disclosure Document.

113.   Following the July 22, 2019 e-mails of Mr. Armstrong, F45 offered and sold Plaintiff a third franchise license for a territory in Novi, Michigan.  A Franchise Agreement related to that territory was entered into on or about

September 30, 2019.  A true and accurate copy of that Franchise Agreement is attached hereto at <u>Exhibit 13</u>.

114.   Significantly, the Franchise Agreement attached hereto at <u>Exhibit 13</u> appears to be based on an F45 Franchise Disclosure Document that was issued on or about April 18, 2019.

115.   Mr. Jordan did not receive a copy of the F45 Franchise Disclosure Document issued on or about April 18, 2019 from F45 prior to entering the Franchise Agreement attached hereto at <u>Exhibit 13.</u>

**D.    F45 Has Violated the Law and Failed to Live Up to Representations and Promises Made During the Course of Courtship, and to Its Own Franchise Agreements**

116.   All of the Franchise Agreements in question which were executed by Plaintiff's Mr. Jordan from the State of Michigan via DocuSign.   Each Franchise Agreement concerns the operation of a franchised business located in the State of Michigan.

117.   Upon information and belief, a representative of F45 executed each of the Franchise Agreements from the State of California via DocuSign.

118.   Plaintiff paid initial franchise fees to F45 for the three territories in question in the amount of $135,000 ($50,000 for North Livonia, $40,000 for Northville, and $45,000 for Novi).

119.   Had Plaintiff known then what it knows now, it would never have entered into any of the three Franchise Agreements with F45.

120.   Time and time again, F45 has failed to live up to the representations and promises made during the course of courtship and to its own Franchise Agreements.   F45 has also failed to appreciate, and take appropriate, good-faith actions in light of, the *force majeure* event that is the COVID-19 pandemic.

121.   Upon information and belief, F45 knew that the representations and commitments that were being made were outdated and otherwise inaccurate, incomplete, unfair, deceptive, and/or misleading on account of, among other things: (i) its experience with franchising in Australia; (ii) its experience with franchising in the European Union; and (iii) its experience with franchising in the United States.

122.   On account of these failings, Plaintiff has lost an estimated amount in excess of $1,262,926 to date, is obligated on a Small Business Administration loan of $323,410, and is obligated on a million-dollar lease.

123.   For example, and without limitations, the financial performance representations that induced Plaintiff have proven to be false and were false at the time they were made.

124.  At some point in 2021, Plaintiff's Mr. Jordan learned that F45 or one of its affiliates owned and operated seven F45 Studios through various subsidiaries.  Around that same time, Plaintiff's Mr. Jordan learned that only one or two of those studios was able to make a profit or break even.

125.  This information is contrary to the representations previously made to Plaintiff by Mr. Marano during the course of courtship with respect to the profitability of F45 studios.

126.  The one studio currently being run by Plaintiff in North Livonia, Michigan is not making a profit or breaking even.  It was only in and around June 2021 that Plaintiff reasonably appreciated and knew that it would come nowhere close to breaking even in three months and reach an EDITBA of 33% by the end of year one, as had been represented by Mr. Marano.

127. As a second example, and without limitation, the leasehold improvement representations, upon which Plaintiff relied upon when considering a location for their franchised business in North Livonia, Michigan, have proven to be grossly false and misleading.

128. Item 7 of the April 19, 2018 Franchise Disclosure Document furnished to Plaintiff's Mr. Jordan lists the costs of "Leasehold Improvements" as being between $1,000 and $10,000.

129.   Item 7 of the April 18, 2019 Franchise Disclosure Document also lists the costs of "Leasehold Improvements" as being between $1,000 and $10,000.

130.   Item 7 of F45's Franchise Disclosure Documents for 2016 and 2017 similarly list the costs "Leasehold Improvements" as being between $1,000 and $10,000.

131.   It was only when Plaintiff began the buildout of its North Livonia studio in late 2019 that it learned that the "Leasehold Improvements" that were necessary were considerably more expensive.

132.   Plaintiff estimates that it has spent the sum of $187,000 in improving the leasehold at 19716 Haggerty Road, Livonia, Michigan 48152, in order to be able to commence operations there.

133.   Upon information and belief, most if not all of F45's Michigan franchisees have spent over $100,000 on leasehold improvements, and in fact most have spent over $200,000 on just the cost of leasehold improvements.

134.   Upon information and belief, F45 franchisee locations in Birmingham, Michigan, Troy, Michigan and Royal Oak, Michigan are owned by limited liability companies which are in turned owned directly or indirectly by Mrs. Danielle Raymond ("Mrs. Raymond").

135.   Upon information and belief, Mrs. Raymond has spent well over $200,000 on just the cost of leasehold improvements for each of the three (3) locations.

136.   Upon information and belief, Mrs. Rayond is married to Michael Raymond ("Mr. Raymond") and Mr. Raymond is on the board of directors of F45 which is a publicly traded company, traded on the New York Stock Exchange under the trading symbol "FXLV."

137.   Upon information and belief, F45, its board of directors, officers, and key employees including all defendants named in this Complaint have actual knowledge that the estimated cost of leasehold improvements of between $1,000 and $10,000 in all of the Franchise Disclosure Documents sent to Plaintiff is a knowingly, grossly inaccurate estimate.

138.   Upon information and belief, F45 was aware of the true costs of leasehold improvements at the time that Plaintiff was courted and induced into a franchise relationship.

139. As a third example, and without limitation, the opening equipment disclosed in the April 19, 2018 Franchise Disclosure Document specifies that a franchisee will receive 210 Lionheart branded heart rate monitors.

140.   Plaintiff was required and did transfer funds to F45 in order to have 210 Heart Rate Monitor and bands delivered based on Schedule 1 to the Franchise Agreement that relates to the North Livonia territory.

141.   Without Plaintiff's knowledge, agreement, or consent, and after Plaintiff had already paid for the 210 monitors, F45 unilaterally changed the quantity of Lionheart branded heart rate monitors from 210 to 130 units.  F45 does not have the right to do this under the applicable Franchise Agreement.

142.   Further, the April 19, 2018 Franchise Disclosure Document represents at Item 6 that the LionHeart bands cost between $25 and $35, but in reality, the bands cost around $62.  Plaintiff only learned about the true cost of the heart monitors around December 2019, after the Franchise Agreements were entered into.

143.   As a fourth example, and without limitation, the April 19, 2018 Franchise Disclosure Document (and the April 18, 2019 Franchise Disclosure Document) does not make any reference to a franchisee needing to purchase music licenses costing about $1,647.50 per year per location.

144.   Without Plaintiff's knowledge, agreement, or consent, F45 required Plaintiff to purchase music licenses from four music licensing agencies for its studio in North Livonia, and, in fact, F45 refused to allow the North Livonia studio to connect with F45's F45TV system, and thereby be able

37

to open, until the licenses had been paid for by Plaintiff.  F45 does not have the right to do this under the applicable Franchise Agreement.

145.  Plaintiff only learned about this alleged obligation to purchase music licenses after Plaintiff had already entered into the Franchise Agreements.

146.  F45 first disclosed the costs of the music licenses in its Franchise Disclosure Document dated April 17, 2020, wherein it listed them as being between "$1,700 to $2,000" annually, even though it was aware of the need for these music licenses at the time it entered into the Franchise Agreements with Plaintiff.

147.  As a fifth example, and without limitation, the April 19, 2018 Franchise Disclosure Document states that a franchisee cannot solicit customers from another franchisee's territory.  Yet in practice, F45 mandates that franchisees advertise to customers in neighboring territories.   This practice on the part of F45 has hurt and damaged the business of Plaintiff in North Livonia.

148.  Plaintiff only learned about the advertising  issue after it entered into the Franchise Agreements.

### Causes of Actions

## COUNT I: BREACH OF CONTRACT
## (Against F45)

149.   Plaintiff incorporates the preceding allegations by reference.

150.   Plaintiff entered into Franchise Agreements with F45 based on offer, acceptance, and consideration.

151.   Plaintiff has performed all its obligations in accordance with the Franchise Agreements and is not in breach, material or otherwise, under any of the Franchise Agreements.

152.   F45, in comparison, has willfully, capriciously, and without cause materially breached various provisions of the Franchise Agreements as previously set forth herein.

153.   As a direct and proximate result of F45's breaches, Plaintiff has suffered damages and will continue to suffer damages in the future.

154.   On account of F45's breaches, Plaintiff is entitled to damages, as well as to legal rescission of the Franchise Agreements.

## COUNT II: BREACH OF IMPLIED DUTY OF GOOD FAITH
## AND FAIR DEALING
## (Against F45)

155.   Plaintiff incorporates the preceding allegations by reference.

156.   The Franchise Agreements in question, and the relationship between Plaintiff and F45, gives rise to a mutually implied covenant of good faith and fair dealing.

157.   F45 had, and continues to have, a duty to act in good faith, and to deal fairly, with Plaintiff.

158.   Additionally, F45 engaged, and continues to engage, in arbitrary or unreasonable conduct that had or has the effect of preventing Plaintiff from receiving the intended fruits of the Franchise Agreements.

159.   By engaging in the acts and tactics detailed above, F45 has violated the implied covenant of good faith and fair dealing.

160.   As a direct and proximate result of F45's unlawful conduct, Plaintiff has suffered damages, and will continue to suffer damages in the future.

### COUNT III: FRAUD, FRAUDULENT INDUCEMENT, AND MISREPRESENTATION
### (Against F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams)

161.   Plaintiff incorporates the preceding allegations by reference.

162.   Defendants made representations regarding various aspects of the F45 Franchise program and system to Plaintiff, which Defendants knew or believed were false.  Defendants knew or believed that the representations

made by them were false, or that the representations were made with reckless indifference to the truth.

163.   Defendants, as set forth above, omitted information from the April 19, 2018 Franchise Disclosure Document that was furnished to Plaintiff, in contravention of relevant federal and state law.

164.   These misrepresentations and omissions by F45 and its representatives were material.  They were made in order to induce Plaintiff into a franchisor-franchisee relationship, and so induced Plaintiff.

165.   Plaintiff reasonably and justifiably relied upon Defendants' misrepresentations and omissions.

166.   Plaintiff suffered injury and damages, and continues to suffer damages, as a result of its reasonable reliance on these misrepresentations and omissions.

167.   Plaintiff is entitled to damages.  It is also entitled to equitable rescission of the Franchise Agreements, based on the fraudulent misrepresentations of Defendants.

## COUNT IV: NEGLIGENT MISREPRESENTATION
### (Against F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams)

168.   Plaintiff incorporates the preceding allegations by reference.

41

169. Defendants, in courting Plaintiff to do business with them, had a pecuniary duty to provide Plaintiff with accurate information.

170. Defendants, instead of providing accurate information, supplied false and/or misleading information to Plaintiff, as alleged above.

171. In providing the information to Plaintiff, Defendants failed to exercise reasonable care in either obtaining the information that they relayed to Plaintiff or in communicating to Plaintiff.

172. Plaintiff justifiably relied upon the information provided by Defendants, which proved to be false.

173. As a result of their reasonable and justifiable reliance, Plaintiff suffered pecuniary loss.

174. Plaintiff is entitled to damages.  It is also entitled to equitable rescission of the Franchise Agreements, based on the fraudulent misrepresentations of F45.

## COUNT V: UNJUST ENRICHMENT
### (Against F45)

175. Plaintiff incorporates the preceding allegations by reference.

176. F45, by its actions and tactics, was enriched from monies wrongfully taken from Plaintiff.

177.   Plaintiff was directly impoverished from these monies wrongfully taken.

178.   It is unjust F45 to retain these monies, which were obtained by misrepresentation and false pretenses.

179.   There is an absence of a remedy provided by law for this unjust enrichment.

180.   Plaintiff is entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained, plus interest, costs, and expenses.

## COUNT VI: VIOLATION OF THE MICHIGAN FRANCHISE INVESTMENT LAW
### M.C.L. § 445.1505.
### (Against F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams)

181.   Plaintiff incorporates the preceding allegations by reference.

182.   F45 is a franchisor under the Michigan Franchise Investment Law ("MFIL"), M.C.L. § 445.1501, *et seq.*

183.   Plaintiff is a franchisee of F45 under the MFIL.

184.   The MFIL applies to "all written or oral arrangements between a franchisor and franchisee in connection with the offer or sale of a franchise, including, though not limited to, the franchise offering, the franchise agreement, sales of goods or services, leases and mortgages of real or personal

property, promises to pay, security interests, pledges, insurance, advertising, construction or installation contracts, servicing contracts, and all other arrangements in which the franchisor or subfranchisor has an interest." See M.C.L. § 445.1504(1).

185.   M.C.L. § 445.1505 provides as follows:

A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

186.   Defendants violated the MFIL when they induced Plaintiff into a franchise relationship with F45.

187.   Plaintiff relied on the information and representations furnished as being accurate and complete when deciding to invest in the franchise opportunities and has suffered damages on account of its reliance.

188.   Indeed, as a result of the Defendants' violations of the MFIL (including Section 5), Plaintiff has suffered damages.

189.   Plaintiff is entitled to relief available under the MFIL, including recision and damages plus interest from the date of purchase at the rate of

12% plus reasonable attorneys fees and court costs pursuant to M.C.L. §
445.1531.

### COUNT VII: VIOLATION OF THE MICHIGAN FRANCHISE INVESTMENT
### LAW M.C.L. § 445.1508.
### (Against F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano,
### Mr. Armstrong, and Mr. Abrahams)

190.   Plaintiff incorporates the preceding allegations by reference.

191.   M.C.L.§ 445.1508 mandates that a franchisor meet certain
disclosure obligations in connection with its offering of a franchise
opportunity.

192.   M.C.L.§ 445.1508 provides,in part, the following:

> (1) A franchise shall not be sold in this state without first
> providing to the prospective franchisee, at least 10 business days
> before the execution by the prospective franchisee of any binding
> franchise or other agreement or at least 10 business days before
> the receipt of any consideration, whichever occurs first, a copy of
> the disclosure statement described in subsection (2), the notice
> described in subsection (3), and a copy of all proposed
> agreements relating to the sale of the franchise. . . .

193.   In violation of M.C.L. § 445.1508, F45 did not, as pled above, meet
its disclosure obligations in connection with its offering of the three franchises
to Plaintiff.

194.   Indeed, as a result of Defendants' violations of the MFIL (including
Section 8), Plaintiff has suffered damages.

45

195.   Plaintiff is entitled to relief available under the MFIL, including recision and damages plus interest from the date of purchase at the rate of 12% plus reasonable attorneys fees and court costs pursuant to M.C.L. § 445.1531.

## COUNT VIII: VIOLATION OF THE MICHIGAN FRANCHISE INVESTMENT LAW M.C.L. § 445,1532.
### (Against Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, Mr. Abrahams)

196.   Plaintiff incorporates the preceding allegations by reference.

197.   Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams were all executives of F45 during the course of time Plaintiff was courted into entering into the three Franchise Agreements at issue.

198.   M.C.L. § 445.1532 provides as follows:

A person who directly or indirectly controls a person liable under this act, a partner in a firm so liable, a principal executive officer or director of a corporation so liable, a person occupying a similar status or performing similar functions, an employee of a person so liable who materially aids in the act or transaction constituting the violation, is also liable jointly and severally with and to the same extent as the person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

199.   Defendants violated the MFIL when they induced Plaintiff into the franchise licenses with F45.

200.   Plaintiff relied on the information and representations furnished as accurate and complete when deciding to invest in the franchise opportunities and have suffered damages on account of its reliance when the information and representations proved to be false, misleading, and incomplete.

201.   As a result of the Defendants' violations of the MFIL (including Section 32), Plaintiffs has suffered damages, and Plaintiff is entitled to relief available under the MFIL, including recision and damages plus interest from the date of purchase at the rate of 12% plus reasonable attorneys fees and court costs pursuant to M.C.L. § 445.1531.

## COUNT IX: VIOLATION OF THE
## CALIFORNIA FRANCHISE INVESTMENT LAW
### Cal. Corp. Code § 31001-31516
### (Against F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano,
### Mr. Armstrong, and Mr. Abrahams)

202.   Plaintiff incorporates the preceding allegations by reference.

203.   F45 and its executives offered and sold the franchise opportunities in question from the State of California.

204.   The California Franchise Investment Law ("CFIL") makes it illegal for any person to offer or sell a franchise by means of any written or oral communication which includes: (i) an untrue statement of material fact; or (ii)

omits to state a material fact necessary in order to make the statements made, under the relevant circumstances, not deceptive or otherwise misleading.

205. F45, directly or through its representatives, knowingly and willingly made false representations to Plaintiff for the purpose of inducing Plaintiff into the Franchise Agreements in question.

206. F45, directly or through its representatives, knowingly and willingly omitted certain material facts from representations that were made so as to make those representations, under the circumstances in which they were made, not misleading.

207. Mr. Gilchrist, Mr. Deutsch, Mr. Marano, Mr. Armstrong, and Mr. Abrahams, in one way or another, were involved in the making of the outdated, stale, inaccurate, incomplete, unfair, deceptive, and/or misleading representations.

208. The CFIL extends liability to individual officers and individuals who, directly or indirectly, control those liable under the statute.

209. Each and all of the individually named Defendants, as well as F45, are jointly and severally liable under the CFIL.

210. Plaintiff relied on the information and representations furnished as accurate and complete when deciding to invest in the franchise opportunities and have suffered damages on account of their reliance.

211.   Indeed, as a result of the Defendants' violations of the CFIL, Plaintiff has suffered damages.

212.   Plaintiff is entitled to all relief available under the CFIL.

**COUNT X: VIOLATION OF THE
DELAWARE UNIFORM DECEPTIVE TRADE PRACTIES ACT
6 DEL. C. § 2531 *et seq.*
(Against F45, Mr. Gilchrist, Mr. Deutsch, Mr. Marano,
Mr. Armstrong, and Mr. Abrahams)**

213.   Plaintiff incorporates the preceding allegations by reference.

214.   Delaware's Uniform Deceptive Trade Practices Act ("UDTP"), § 2532, states, in pertinent part, as follows:

A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

...

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have ... or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

215.   Defendants, as alleged above, made representations regarding various aspects of the franchises to Plaintiff, which Defendants knew or believed were false.

216.  Defendants, as also detailed above, omitted information from the franchise agreements that it provided to Plaintiff, which it was required to disclose under relevant federal and state law.

217.  In making these misrepresentations, Defendant caused a likelihood or of misunderstanding as to the goods or services being acquired by the Plaintiff.  In doing so, Defendants violated the UDTP.

218.  Plaintiff suffered damages as a result of this violation, and is entitled to all relief allowed under the UDTP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Functional HIIT Fitness, LLC requests relief on all claims/causes of action against Defendants F45 Training Incorporated, Adam Gilchrist, Robert Deutsch, Marc Marano, Luke Armstrong, and Nick Abrahams as follows:

A.    Rescission of the Franchise Agreements and all ancillary arrangements;

B.    An award of actual damages in excess of $75,000 exclusive of interest, fees, and costs;

C.    An award of compensatory damages in excess of $75,000 exclusive of interest, fees, and costs;

D.      An award of special damages in excess of $75,000 exclusive of interest, fees, and costs;

E.      An award of enhanced damages in excess of $75,000 exclusive of interest, fees, and costs;

F.      An award of exemplary damages in excess of $75,000 exclusive of interest, fees, and costs;

G.      An award of restitution;

H.      Pre- and post-judgment interest as allowed by the applicable statute governing the relief awarded, including, but not limited to 12% interest pursuant to M.C.L. § 445.1531;

I.      An award of reasonable attorney fees and costs pursuant to M.C.L. § 445.1531 and any other applicable rule or statute; and

J.      Any and all other relief deemed by the Court to be just and proper.

## JURY DEMAND

The Plaintiff, by and through their attorneys and pursuant to Fed. R. Civ. P. 38, hereby demand a jury trial in this action.

Respectfully submitted,

AUGUST LAW, PLLC

By:      */s/ Gary K. August*
      Gary K. August (P48730)
      29201 Telegraph Road, Suite 150
      Southfield, MI 48034
      (248) 833-6225
      gaugust@august-law.com

      O'HAGAN MEYER, PLLC
      Ari N. Stern (Admitted E.D. Mich.)
      Justin J. Twigg (P84023)
      21800 Haggerty Road, Suite 106
      Northville, Michigan 48167
      (248) 896-1801
      astern@ohaganmeyer.com
      jtwigg@ohaganmeyer.com

**ATTORNEYS FOR PLAINTIFF**

Dated: January 26, 2022